IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSHUA BOOZE, | : | CIVIL NO. 1:13-CV-2139 |
| | : | |
| **Plaintiff** | : | (Judge Kane) |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| JOHN WETZEL, et al., | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

On August 13, 2013, the plaintiff, Joshua Booze, a state inmate, filed a *pro se*

complaint naming 22 correctional officials, court officers, police and prosecutors as

defendants. (Doc. 1.) Liberally construed, Booze's complaint seemed to allege, albeit

in an inadequate fashion, that these officials retaliated against the plaintiff, interfered

with his right of access to the courts, denied him due process, and conspired together

to violate his constitutional rights.

Upon a screening review, it was recommended that the complaint be dismissed

without prejudice to the filing of an amended complaint, (Doc. 10.), a recommendation

which the district court adopted.  (Doc. 11.)  Booze then filed an amended complaint,

(Doc. 14.), which is the operative pleading in this lawsuit.  This amended complaint

is a 20 page, 99 paragraph pleading, which contains a welter of claims against a diverse array of defendants. With respect to the corrections defendants, however, we can discern five distinct categories of claims that Booze appears to be making in this pleading.

First, Booze seems to allege that the defendants improperly placed and kept him in restricted housing, administrative custody (AC), and designated him for the Restricted Release List (RRL), a list of inmates who are housed on strict security conditions. Second, Booze asserts that a series of supervisory defendants, including defendants Wetzel, Klopotoski, Varano, Ellett, Miller, Luscavage, and Miller, violated his rights by refusing to act favorably upon various grievances which Booze lodged with these supervisory officials. Third, Booze then asserts, at some length, that correctional staff, including defendants Jellen, White, Keller, Moraski, Stetler and Long, have violated his First Amendment rights by stealing and tampering with his mail. Fourth, Booze seems to allege that some defendants denied him access to the courts, by delaying the filing of a *pro se* habeas corpus petition that Booze wished to submit complaining about the conditions of his confinement. Finally, Booze's amended complaint contains far-reaching, but poorly defined claims of retaliation against the plaintiff, and asserts that the defendants have participated in a broad, but amorphous, conspiracy to harm him.

Presented with this multi-faceted amended complaint, the correctional defendants have filed a motion to dismiss some of the claims and defendants named by Booze in his pleadings,[1] arguing that the amended complaint, like the original pleading that was found inadequate by the court, fails to state a claim upon which relief may be granted. (Doc. 40.) This motion is fully briefed by the parties, (Docs. 41 and 50.), and is, therefore, ripe for resolution.

For the reasons set forth below, it is recommended that the motion to dismiss be granted, in part, and denied, in part.

## II.   Discussion

### A.   Motion to Dismiss, Standard of Review

The defendants have moved to dismiss this amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

---

[1] We note that, in some instances, the defendants' motion to dismiss seems to relate to claims set forth in Booze's original complaint, (Doc. 1.), rather than his amended complaint. (Doc. 14.)(See Doc. 41, pp.1-3.) Nonetheless, because there is a substantial overlap between a number of the claims made in these two complaints, we will consider these arguments as they apply to the amended complaint, (Doc. 14.), which is now the operative pleading in this lawsuit.

> Standards of pleading have been in the forefront of jurisprudence in recent years.  Beginning with the Supreme Court's opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) continuing with our opinion in <u>Phillips</u> [<u>v. County of Allegheny</u>, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in <u>Ashcroft v. Iqbal</u> –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff.  <u>Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.</u>, 20 F.3d 1250, 1261 (3d Cir. 1994).  However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." <u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).  Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." <u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983).  As the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." <u>Id.</u> at 555.

"Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss.  In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.  Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions.  Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation.  As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis.  First, the

factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed: "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal.  The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' Twombly, 550 U.S. at 570, 127 S.Ct. 1955.  A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955).  This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' Id.  A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L. Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead

to state a claim.' Iqbal, 129 S.Ct. at 1947.  Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950.  Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

Judged against these benchmarks, for the reasons set forth below we find that Booze has failed to state a claim upon which relief may be granted with regard to a number of the allegations set forth by Booze in his amended complaint.

### B.    Booze Has Failed to State a Valid Due Process Claim With Respect to His Custodial Status

In this case, Booze has leveled far-reaching, yet amorphous, constitutional claims against the correctional defendants, alleging at the outset that his placement and retention in administrative custody (AC) and designation to a Restricted Release List (RRL) violated his due process rights.  Booze's placement on the Restricted Release List and his confinement in AC are issues that lie at the heart of this amended civil rights complaint.  Specifically, Booze seems to continue to complain that he never received a due process hearing prior to being placed on the Restricted Release List, or an opportunity to appeal this placement, which he alleges violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Booze also appears to challenge the duration of his status in Administrative Custody, claiming that this extended placement on the RRL violated his due process rights. (Id.)   Thus, Booze's renewed due process claims call upon us to consider the procedures established by the Department of Corrections governing RRL housing status in the prison system.

According to DOC policy DC-ADM 802, Administrative Custody is defined as "a status of confinement for non-disciplinary reasons that provides closer supervision, control, and protection than is provided in general population."   DC-ADM 802, Section 3(A)(1).   An inmate confined on AC status does not have the privileges available in general population security level housing, and instead, receives a more limited set of privileges afforded within the Restricted Housing Unit.   Id.   Under DOC regulations, an inmate may be transferred from general population to administrative custody by order of the shift commander for the following reasons:

> a. the inmate is in danger by/from some person(s) in the facility and cannot be protected by alternate measures;
>
> b. placement in general population would endanger the inmate's safety or welfare when it is not possible to protect him/her by other means;
>
> c. the inmate is a danger to himself/herself or others;
>
> d. the inmate is suspected of being or is the instigator of a disturbance;
>
> e. the inmate would pose an escape risk in a less secure status;

f. the inmate has been charged with, or is under investigation for a violation of facility rules and there is a need for increased control pending disposition of charges or completion of the investigation;

g. the inmate has requested and been granted self-confinement;

h. the inmate is being held temporarily for another authority and is not classified for the general population of the holding facility; however, a Parole Violator (PV) and temporary transfers from another facility are eligible for release to general population;

I. the inmate has a detainer for a pending capital case, for which the prosecution is seeking the death penalty;

j. no records and/or essential information are available to determine the inmate's custody level or housing needs; and/or

k. the inmate has completed a Discipline Custody (DC) sanction but one or more of the above reasons exist, (or the facility has an operational need (e.g., appropriate bed space) to temporarily assign the inmate to AC status).

DC-ADM 802, Section 1(A)(1).

Moreover, a Facility Manager or his or her designee may request that the Secretary place an inmate on Administrative Custody status on the Restricted Release List when the inmate "poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern." Id. at Section 1(B).[2] Inmates on the Restricted Release List are a subset of the inmates

_____

[2] Specifically, criteria for placing an inmate on the RRL include, but are not limited to, the following:

a. assaultive history against staff;

who have been placed in the RHU on Administrative Custody status.   An RRL

designation merely changes the final decision-maker with the authority to release the

inmate from AC status into the prison's general population.  Id.  Specifically, when an

inmate is placed on the Restricted Release List, the designation takes the authority to

release the inmate from AC status from the Program Review Committee ("PRC") and

transfers it to the Secretary or his or her designee.  Id.

Furthermore, both RRL and non-RRL inmates have their custody status

periodically reviewed by the PRC.  In the case of a non-RRL inmate, either the PRC

or the Superintendent has the final authority to release the inmate into general

population.  See DC-ADM 802, Section 4(A).  In the case of a RRL inmate, however,

the PRC may recommend the inmate's release from AC status into general population,

_____

      b. assaultive history against inmate(s);

      c. sexual assault history;

      d. escape history, or serious escape attempt;

      e. threat to the orderly operation of a facility (i.e., attempting to organize inmates, demonstrated involvement in a Security Threat Group (STG) that poses a risk to the security of the facility, etc.);

      f. Special Management Unit (SMU) graduate who remains a threat; and/or

      g. SMU failure.

DC-ADM 802, Section 1(B)(2).

but the release requires the approval of the Secretary of Corrections or his or her designee.  See id.  In all other respects, RRL inmates are treated identically to their non-RRL counterparts on AC status.  See id.

Given this regulatory framework, in analyzing Booze's procedural due process claims, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing Fuentes v. Shevin, 407 U.S. 67 (1972)).  Once we determine that a property or liberty interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it.  Id. (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  Protected liberty or property interests generally arise either from the Due Process Clause or from state-created statutory entitlement.  See Board of Regents v. Roth, 408 U.S. 564, 575 (1972).  However, in the case of prison inmates,

> [i]n Sandin v. Conner, the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by procedural due process guarantees.  Although the Court acknowledged that liberty interests could arise from means other than the Due Process Clause itself, the Court concluded that state-created liberty interests could arise only when a prison's action imposed an '*atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life*.' . . . In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Court considered the following two factors:

> 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.

Shoats, 213 F.3d at 143-44(citations omitted, emphasis added).

In accordance with these constitutional benchmarks we conclude that Booze has failed to allege facts that show how his initial placement on the RRL has subjected him to "atypical and significant hardship."  In fact, the RRL is comprised of inmates who are restricted from being released from AC status without the prior approval of the Secretary or his or her designee.  See DC-ADM 802.  This means that, unlike most other inmates in administrative custody, an inmate on the RRL may not be released from administrative custody by order of the Program Review Committee.  DC-ADM 802, Section 4.  Instead, the Program Review Committee may only recommend release, with the ultimate decision to be made by the Secretary or his or her designee. Id.  Thus, placement on the RRL simply causes a change in the identity of the decision-maker as to whether Booze should be released.

We further note that the exhibits which Booze has attached to his response to this motion to dismiss include records of prior disciplinary proceedings in which Booze pleaded guilty to possession of a contraband weapon, a razor blade.  (Doc. 50, Exhibits.)  This conduct, which was admitted to by Booze, clearly fall within the

criteria identified by the Department of Corrections for RRL designation.  Therefore,
we find that Booze's initial placement in AC and designation on the RRL did not alter
the amount of time he was placed into disciplinary segregation; nor did it render the
conditions of his confinement significantly more restrictive, and did not impose an
atypical and significant hardship on the inmate in relation to the ordinary incidents of
prison life.  For these reasons, we  conclude that Booze has not pleaded facts alleging
that he was deprived of a liberty interest as a result of his placement on the RRL, a
finding that remains consistent with other decisions of the Third Circuit and district
courts within the Third Circuit.  See Bowen v. Ryan, 248 F. App'x 302, 304 (3d Cir.
2007) ("Appellant's claim that he was placed on the Restricted Release List without
due process was properly dismissed.  Placement on this List did not deprive Bowen
of his liberty, privileges, or any other constitutionally protected liberty interest.");
Nifas v. Beard, 2009 U.S. Dist. LEXIS 93235, 48-49 (W.D. Pa. Sept. 30, 2009)
("[P]lacement on the RRL could not amount to a deprivation of a liberty interest at all
because, at most, it accomplishes only a change in the identity of the decision maker
as to whether Plaintiff should be released from the AC or not.") affirmed and modified
on other grounds at Nifas v. Beard, 374 Fed. Appx. 241 (3d Cir. 2010); Hill v. Fisher,
2010 U.S. Dist. LEXIS 141855 (M.D. Pa. Nov. 17, 2010) ("Placement on the
Restricted Release List does not deprive an inmate of a liberty interest protected by the

Due Process Clause"). Thus, regarding Booze's initial placement in AC and designation on the RRL, we conclude that the amended complaint fails to state a due process claim upon which relief may be granted.

Similarly, to the extent that Booze is challenging the duration of his RRL designation and confinement on due process grounds, we note that the exhibits which Booze has attached to his response to this motion to dismiss reveal that Booze received regular, periodic administrative reviews of his custodial status from correctional officials. In this setting it has been "held that periodic review of inmates indefinitely confined to administrative custody meets due process requirements. Shoats v. Horn, 213 F.3d 140, 147 (3d Cir.2000)." Washington-El v. Beard, 562 F. App'x 61, 63 (3d Cir. 2014). Since the exhibits provided by Booze show that such periodic reviews were conducted by prison officials in his , this due process claim also fails as a matter of law.

## C. Booze's Supervisory Liability Claims Fail

In this case Booze's amended complaint also appears to assert that a series of supervisory defendants, including defendants Wetzel, Klopotoski, Varano, Ellett, Miller, Luscavage, and Miller, violated his rights by refusing to act favorably upon various grievances which Booze lodged with these supervisory officials. In considering claims brought against supervisory officials arising out of alleged

constitutional violations, the courts recognize that prison supervisors may be exposed to liability only in certain, narrowly defined, circumstances.

At the outset, it is clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendants were prison supervisors when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

Ashcroft v. Iqbal,  556 U.S. 662, 676 (2009).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates.  O'Connell v. Sobina, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004). Rather, "[p]ersonal involvement must be alleged *and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them.  See* Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)." Jetter v. Beard, 183 F. App'x 178, 181 (3d Cir. 2006)(emphasis added).

Furthermore, to the extent that Booze's supervisory liability claims rest on the premise that officials did not after-the-fact act favorably upon his past grievances, this claim also fails.  An inmate cannot sustain a constitutional tort claim against prison supervisors based solely upon assertions that officials failed to adequately investigate or respond to his past grievances.  Inmates do not have a constitutional right to a prison grievance system.  Speight v. Sims, 283 F. App'x 880 (3d Cir. 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001) ("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner.").  Consequently, dissatisfaction with a response to an inmate's grievances does not support a constitutional claim.  See also Alexander v. Gennarini, 144 F. App'x 924 (3d Cir. 2005) (involvement in post-incident grievance process not a basis for § 1983 liability); Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable).  See also Cole v. Sobina, No. 04-99J, 2007 WL 4460617, at *5 (W.D. Pa. Dec. 19, 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern.").  As the United States Court of Appeals for the Third Circuit observed when disposing of a similar claim by another inmate:

> Several named defendants, such as the Secretaries of the Department of Corrections or Superintendents, were named only for their supervisory

roles in the prison system. The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*); see also Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir.1996) (state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause).

Pressley v. Beard, 266 F. App'x 216, 218 (3d Cir. 2008).

Indeed, as to such claims, the United States Court of Appeals for the Third Circuit has held that summary dismissal is appropriate "because there is no apparent obligation for prison officials to investigate prison grievances. See Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 382 (2d Cir.1973)." Paluch v. Sec'y Pennsylvania Dept. Corr., 442 F. App'x 690, 695 (3d Cir. 2011). In sum, to the extent that the plaintiff's claims against these supervisory defendants consist of little more than assertions of *respondeat superior* liability, coupled with dissatisfaction with the processing of this inmate's past grievances, these assertions do not suffice to state a constitutional tort claim. Therefore, these defendants are entitled to be dismissed from this case.

### D. Booze's Claims of a Conspiracy to Deny Him Access to the Courts Also Fail

In his amended complaint Booze also asserts in a conclusory fashion that defendants Long, Stetler and others engaged in a conspiracy to deny him access to the

courts by delaying the filing of a *pro se* petition for writ of habeas corpus that Booze sought to file challenging the conditions of his confinement.  Booze's conspiracy claim, which is also pleaded in a conclusory fashion without supporting factual detail, also fails to state a claim upon which relief may be granted.  In this regard, as we have previously noted:

> [I]n order to plead a civil rights action based upon a claim of conspiracy, a plaintiff must plead allegations that are:
>
>> supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each defendant allegedly played in carrying out those objectives.  Bare conclusory allegations of "conspiracy" or "concerted action" will not suffice to allege a conspiracy.  The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred.

Flanagan v. Shively, 783 F.Supp. 922, 928 (M.D.Pa.1992).  Furthermore, when pleading a conspiracy claim, a plaintiff cannot rely upon subjective suspicion and speculation.  Young v. Kann, 926 F.2d 1396, 1405 n. 16 (3d Cir.1991).  Quite the contrary, "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred.  D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1377 (3d Cir.1992); see also Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir.2008) (stating that a conspiracy requires a 'meeting of the minds') (further citation omitted).  This holding remains good law following Twombly and Iqbal, which, in the conspiracy context, require 'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'  Twombly, 550 U.S. at 556, 127 S.Ct. 1955, 167 L.Ed.2d 929."  Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir.2010) cert. denied, —— U.S. ——, 131 S.Ct. 1798, 179 L.Ed.2d 655 (U.S.2011).  We are mindful of these pleading

requirements, which are considered together with the standards of pleading applicable to all civil actions in federal court as defined in Twombly and Iqbal, supra.

Victor v. Huber, No. 3:12-CV-282, 2012 WL 7463723, at *14 (M.D. Pa. Nov. 29, 2012) report and recommendation adopted sub nom. Victor v. Hubbard, No. 3:12-CV-00282, 2013 WL 704654 (M.D. Pa. Feb. 26, 2013).

Here, Booze's amended complaint fails to meet the pleading standards for a valid civil conspiracy claim.  The claims of conspiracy set forth in the amended complaint are speculative and conclusory.  In the absence of other well-pleaded factual assertions, Booze's conspiracy claim amounts to little more than labels and conclusions, and a formulaic recitation of the elements of a cause of action, and, as such, fails as a matter of law.

These claims fail as a matter of law for another reason as well.  Since 1977, the United States Supreme Court has recognized that inmates have a constitutional right of access to the courts.  Bounds v. Smith, 430 U.S. 817 (1977).  As the Supreme Court initially observed, this right of access to the courts is satisfied when corrections officials facilitate "meaningful" access for those incarcerated, either through legal materials or the assistance of those trained in the law.  Id. at 827 ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.")

Two decades later, in 1996, the Supreme Court provided further definition and guidance regarding the scope and nature of this right of access to the courts in <u>Lewis v. Carey</u>, 518 U.S. 343 (1996).  In <u>Lewis</u>, the Court eschewed efforts to define this right in abstract, or theoretical terms, but rather cautioned courts to focus on concrete outcomes when assessing such claims.  As the Court observed:

> Because <u>Bounds</u> did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's . . .  legal assistance program is subpar in some theoretical sense. . . .  Insofar as the right vindicated by <u>Bounds</u> is concerned, "meaningful access to the courts is the touchstone," <u>id</u>., at 823, 97 S.Ct., at 1495 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the  . . . legal assistance program hindered his efforts to pursue a legal claim. . . . .  Although <u>Bounds</u> itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite.  An actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which <u>Bounds</u> relied, <u>see id</u>., at 821-825, 97 S.Ct., at 1494-1497.  Moreover, the assumption of an actual-injury requirement seems to us implicit in the opinion's statement that "we encourage local experimentation" in various methods of assuring access to the courts.  <u>Id</u>., at 832, 97 S.Ct., at 1500.

<u>Lewis v. Casey</u>, 518 U.S. 343, 351-52 (1996).

Thus, following <u>Lewis</u> courts have consistently recognized several guiding principles which animate access-to-court claims by prisoners.  First, such claims require some proof of an actual, concrete injury, in the form of direct prejudice to the plaintiff in the pursuit of some legal claim.  <u>See, e.g.</u>, <u>Oliver v. Fauver</u>, 118 F.3d 175

(3d Cir. 1997); <u>Demeter v. Buskirk</u>, No. 03-1005, 2003 WL 22139780 (E.D. Pa. Aug. 27, 2003); <u>Castro v. Chesney</u>, No. 97-4983, 1998 WL 150961 (E.D. Pa. March 31, 1998).  Furthermore, in order to bring a claim based upon the right of access to the courts, inmates must claim "(1) that they suffered an actual injury—that they lost a chance to pursue a non-frivolous or arguable underlying claim; and (2) that they have no other remedy that may be awarded as recompense for the lost claim other than in the present denial of access suit." <u>Monroe v. Beard</u>, 536 F.3d 198, 205 (3d Cir.2008) (quoting <u>Christopher v. Harbury</u>, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)) (internal quotations omitted).  In other words,  in order to state a claim upon which relief may be granted an inmate-plaintiff's complaint must "describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.' "   <u>Monroe</u>, 536 F.3d at 205–06 (quoting <u>Christopher</u>, 536 U.S. at 416–17).

Here,  the lost claim that serves as the lynchpin of Booze's access-to-courts claim is a habeas corpus petition relating to the conditions of his confinement, namely, his placement in restricted housing.  Cast in this way, it appears that Booze's lost claim was little more than a mere hope since his complaints about the conditions of his confinement simply do not sound in habeas.  The writ of habeas corpus, one of the protections of individual liberties enshrined in our Constitution, serves a specific, and

well-defined purpose.  The writ of habeas corpus exists to allow those in the custody of the state to challenge in court the fact, duration and lawfulness of that custody.  As the United States Court of Appeals for the Third Circuit has aptly noted: "The underlying purpose of proceedings under the 'Great Writ' of habeas corpus has traditionally been to 'inquire into the legality of the detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be unlawful.' " <u>Powers of Congress and the Court Regarding the Availability and Scope of Review</u>, 114 Harv. L.Rev. 1551, 1553 (2001)." <u>Leamer v. Fauver,</u> 288 F.3d 532, 540 (3d Cir. 2002).  However, there is a necessary corollary to this principle, one which has long been recognized by the courts; namely, "[i]f a . . . prisoner is seeking [other relief], he is attacking something other than the fact or length of his confinement, and he is seeking something other than immediate or more speedy release-the traditional purpose of habeas corpus.  In [such cases], habeas corpus is not an appropriate or available federal remedy." <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 494 (1973).

Thus, where a prisoner wishes to constitutionally challenge some aspect of the conditions of his confinement unrelated to the fact or duration of his detention, courts have repeatedly held that the writ of habeas corpus is not the proper vehicle for bringing this legal challenge.  For example, in <u>Leamer v. Fauver, supra</u> the United

States Court of Appeals discussed whether a habeas corpus petition was the appropriate tool for an inmate to use when challenging a prison placement decision. In terms that are equally applicable here, the Court of Appeals held that these type of claims are not cognizable under habeas, stating:

> When read together, there is a logical and coherent progression of Supreme Court jurisprudence clarifying when [habeas and other civil rights relief] is unavailable: whenever the challenge ultimately attacks the "core of habeas" - the validity of the continued conviction or the fact or length of the sentence-a challenge, however denominated and regardless of the relief sought, must be brought by way of a habeas corpus petition. Conversely, when the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence or undo his conviction, an action under [other civil rights statutes] is appropriate.

Leamer, 288 F.3d at 542 .

Following Leamer, courts have often considered invitations by inmates to use the writ of habeas corpus to examine prison placement and housing decisions. These invitations have been consistently declined by the courts as a legal exercise which falls beyond the scope of habeas corpus jurisdiction.  See, e.g., Bedenfield v. Lewisburg, 393 F. App'x 32, 33 (3d Cir. 2010)(challenge to  placement in the SMU is analogous to the "garden variety prison transfer" that we have indicated should be challenged in a civil rights action, not via a habeas petition, citing Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 243 (3d Cir.2005)); Dickerson v. Diguglielmo, 306 F. App'x 707 (3d Cir. 2009); Jupiter v. Warden, U.S.P. Lewisburg, 237 F. App'x 726 (3d Cir.

2007); Levi v. Holt, 193 F. App'x 172 (3d Cir. 2006); Beckley v. Miner, 125 F. App'x 385 (3d Cir. 2005).

Since Booze could not have used a petition for writ of habeas corpus to challenge the conditions of his confinement, he has not met the first prerequisite for a valid access-to-courts claim. He has not "describe[d] the underlying arguable claim well enough to show that it is 'more than mere hope.'" Monroe, 536 F.3d at 205–06 (quoting Christopher, 536 U.S. at 416–17). Therefore, this claim fails as a matter of law.

### E.    Booze's Retaliation Claim Fails on these Pleadings

Booze has also advanced a retaliation claim in his amended complaint based upon general allegations that these housing and transfer decisions were made in retaliation for other various complaints and grievances which he has filed in the past. For the most part, these retaliation claims are largely advanced in the abstract, with Booze apparently viewing all adverse prison decisions through a retaliatory prism, and characterizing any actions which he deemed adverse to also be retaliatory.

At the outset, with respect to claims concerning his housing or transfer it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates

do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id. Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution.  See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985).  Even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta).  In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, to any  security classification, or to any particular housing assignment.  See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427 U.S. at 242; Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995); Marchesani v. McCune, 531 F.2d 459 (10th Cir.1976).  Therefore, it is clear that an inmate like Booze has no constitutional right to a particular special housing status. See, e.g., DeFranco  v. Wolfe, 387 F. App'x 147 (3d Cir. 2010)(denying inmate Z-Code cell transfer retaliation claim); Emile v. SCI-Pittsburgh,

No. 04-974, 2006 WL 2773261, *6 (W.D.Pa. Sept. 24, 2006) (denying inmate preliminary injunction in the form of Z-code cell status); Brown v. Sobina, No. 08-128E, 2008 WL 4500482 (W.D.Pa. Oct. 7, 2008)(denying inmate preliminary injunction); Messner v. Bunner, No. 07-112E, 2009 WL 1406986 (W.D.Pa. May 19, 2009)(denying inmate preliminary injunction in the form of Z-code cell status). Accordingly, to the extent that Booze attempts to premise this claim on some constitutional right to a particular housing arrangement, the claim plainly fails to state a cause of action upon which relief can be granted.

Apparently recognizing the fact that he is not entitled to a particular transfer or housing status, Booze has cloaked his constitutional claims as a cause of action against prison officials based upon allegedly retaliatory transfers and housing decisions within the prison. Booze faces a demanding burden of proof in attempting to allege such a retaliation claim based upon circumstantial proof. Inmates like Booze frequently invite courts to infer retaliatory motives to cell assignments and other prison policies. Yet, these invitations, while frequently made, are rarely embraced by the courts. Compare DeFranco v. Wolfe, 387 F. App'x 147 (3d Cir. 2010) (denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); Alexander v. Fitch, No. 07-1732, 2010 WL 1257709 (W.D. Pa. March 26, 2010)(same); Carpenter v. Kloptoski, No. 08-2233, 2010 WL 891825 (M.D. Pa. March 10, 2010)(same); Solan

v. Ranck, No. 06-49, 2007 WL 141918 (M.D.Pa. Jan. 18, 2007)(denying retaliation claim, in part); with Curtician v. Kessler, No. 07-286, 2009 WL 2448106 (W.D. Pa. Aug. 7, 2009)(factual issues preclude dismissal of inmate cell transfer retaliation claim).

Rather, a prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove the following three elements: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). Examples of adverse actions that have, in certain cases, been found to support a retaliation claim include filing false misconduct reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001), and placing a prisoner in administrative custody, Allah, 229 F.3d at 225.

The third essential element to a retaliation claim is that there be a causal link between the exercise of a constitutional right and the adverse action taken against the prisoner. Rauser, 241 F.3d at 333-34. To establish this third, and crucial, component to a constitutional retaliation claim, causation, Booze must make an exacting showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir.2000).

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions

or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D.Pa. Apr.13, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir.1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged

retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." <u>Marasco</u>, 318 F.3d at 512 (quoting <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir.1997)) . . . [T]he Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, <u>see</u> <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279 & n. 5 (3d Cir.2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of . . . wrongdoing, <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 189 (3d Cir.2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

<u>Conklin v. Warrington Tp.</u>, No. 06-2245, 2009 WL 1227950, *3 (M.D.Pa. April 30, 2009).

Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks, months or years separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation. Thus, "[o]ur sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation. <u>See</u> <u>Killen v. N.W. Human Servs., Inc.</u>, No. 06-4100, 2007 WL 2684541, at *8 (E.D.Pa. Sept.7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); <u>see also</u> <u>Farrell</u>, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); <u>Smith v. ABF Freight Sys., Inc.</u>, No. 04-2231, 2007 WL 3231969, at *11 (M.D.Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was

insufficient to establish causation); <u>Mar v. City of McKeesport</u>, No. 05-19, 2007 WL 2769718, at *4 (W.D.Pa. Sept.20, 2007) (holding that temporal proximity of three months was insufficient to establish causation)." <u>Fischer v. Transue</u>, 04-2756, 2008 WL 3981521, *10 (M.D.Pa. Aug. 22, 2008)(holding that temporal proximity of three weeks was insufficient to establish causation).

In practice, application of these legal tenets has often led to the rejection of retaliation claims as legally insufficient when those claims are like the retaliation assertion made here:  An assertion of retaliation based largely on circumstantial proof of some temporal link between the plaintiff's conduct and the defendants' actions when the evidence shows that these events are separated by a significant temporal gulf.  <u>See, e.g.</u>, <u>DeFranco  v. Wolfe</u>, 387 F. App'x 147 (3d Cir.  2010)(denying inmate cell transfer retaliation claim, two months temporal proximity insufficient); <u>Bailey v. Commercial National Insurance Co.</u>, 267 F. App'x, 167 (3d Cir. 2008)(employment discrimination-retaliation case, four months  temporal  proximity  insufficient); <u>Richmond v. ONEOK, Inc</u>., 120 F.3d 205, 209 (10th Cir.1997) (3-month period insufficient); <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient); <u>Conklin v. Warrington Tp.</u>, No. 06-2245,  2009 WL 1227950 (M.D.Pa. April 30, 2009)(two months temporal proximity insufficient); <u>Rogers v. Delaware, Dept. of Public Safety/DMV</u> 541 F.Supp.2d 623, 627 (D.Del. 2008) (10

months insufficient); <u>Brown v. Boeing</u>, 468 F.Supp.2d 729 (E.D.Pa. 2007)(3-4 months insufficient); <u>Lumban-Tobing v. Potter</u>, No. 04-979, 2005 WL 2100691 (M.D. Pa. Aug. 30, 2005)(9 months insufficient temporal proximity, but other proof creates factual issue precluding summary judgment).

Finally, if a plaintiff discharges his obligation to satisfy this three-part *prima facie* test, the burden then shifts to the defendant to prove by a preponderance of the evidence that he or she would have made the same decision absent the protected conduct for reasons reasonably related to penological interest. <u>Carter</u>, 292 F.3d at 158. "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334.

Here, the well-pleaded facts recited by Booze simply do not permit a reasonable inference of retaliation against him by prison officials.  Indeed, there seems to be few well-pleaded facts in the amended complaint which would enable us to understand a retaliation claim by Booze.  Furthermore, much of Booze's alleged petitioning activity described in his amended complaint appears to have occurred *after* some of events he deemed retaliatory, a chronology which is totally inconsistent with the causal element

that is essential to a retaliation claim, where the retaliation typically follows the petitioning activity.[3]   In sum, given the lack of any unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory conduct of prison officials, Booze's retaliation claim, in its present form, fails as a matter of law and should be dismissed.

## F.   Some of Booze's Claims Are Time-Barred

In addition, some of Booze's claims are time-barred.  Booze initially filed this action on August 13, 2013.  Yet, in certain respects Booze's amended complaint advances claims which pre-date August 2011.  These claims which pre-date August 2011 encounter the obstacle of the statute of limitations.  It is well-settled that claims brought pursuant to 42 U.S.C. § 1983 are subject to the state statute of limitations for personal injury actions.  Wilson v. Garcia, 471 U.S. 261, 266-67 (1985).  In Pennsylvania, the statute of limitations for a personal injury action is two years.  42 Pa.C.S.A. § 5524.  A cause of action accrues for statute of limitations purposes when

---

[3]For example, in his amended complaint Booze describes a series of adverse actions which he alleges took place between July 2011 and February 2012.  (Doc. 14, paragraphs 27-44.)  However, the grievance petitioning and litigation which Booze seems to assert gave rise to retaliation against him, as described in the amended complaint, appears to commence *after* these events in February of 2012 and end in September 2012.  (Doc. 14, paragraphs 45-83.)  Legally, logically, topically and temporally, we believe that it is essential to the causation element of a retaliation claim that the adverse, allegedly retaliatory, action take place after the plaintiff's protected activity, and not the other way around.

the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action.  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir. 1998); see also, Nelson v. County of Allegheny, 60 F.3d 1010 (3d Cir. 1995).

While this two-year limitations period may be extended based upon a continuing wrong theory, a plaintiff must make an exacting showing to avail himself of this grounds for tolling the statute of limitations.  For example, it is well settled that the "continuing conduct of [a] defendant will not stop the ticking of the limitations clock [once] plaintiff obtained requisite information [to state a cause of action].  On discovering an injury and its cause, a claimant must choose to sue or forego that remedy." Barnes v. American Tobacco Co., 161 F.3d 127, 154 (3d Cir. 1998) (quoting Kichline v. Consolidated Rail Corp., 800 F. 2d 356, 360 (3d Cir. 1986)).  See also Lake v. Arnold,  232 F.3d 360, 266-68 (3d Cir. 2000).  Instead:

> The continuing violations doctrine is an "equitable exception to the timely filing requirement." West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir.1995).  Thus, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related  acts that would otherwise be time barred."  Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir.1991).  In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts."  West, 45 F.3d at 755 (quotation omitted).  Regarding this inquiry,

> we have recognized that courts should consider at least three factors: (1) subject matter-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.  See id. at 755 n. 9 (citing Berry v. Board of Supervisors of Louisiana State Univ., 715 F.2d 971, 981 (5th Cir.1983)).  The consideration of "degree of permanence" is the most important of the factors.  See Berry, 715 F.2d at 981.

Cowell v. Palmer Township. 263 F.3d 286, 292 (3d Cir. 2001).

Here, to the extent that matters pre-dating August 2011 are the subject of Booze's amended complaint, it is evident from the plaintiff's description of these events in his amended complaint that those matters had a degree of permanence which should have triggered the plaintiff's awareness of and duty to assert his rights. Therefore, in the absence of some showing of equitable tolling, a showing which Booze does not make, these claims fall beyond the statute of limitations and should be time-barred.

## G.     Booze's Pendant State Intentional Tort Claims Should Be Dismissed

In addition to his federal claims brought under 42 U.S.C. § 1983, Booze has attempted to fashion state-law intentional tort claims against the individual defendants

for what he alleges was intentional misconduct on their part.  As explained below, these claims fail as a matter of law because state law expressly bars them.

Under Pennsylvania law, the Commonwealth, its agencies and employees enjoy broad immunity from most state-law tort claims, as the General Assembly has by statute provided that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity."  1 Pa. Cons. Stat. Ann. § 2310; see also Moore v. Commonwealth, 538 A.2d 111, 115 (Pa. Commw. Ct. 1988) ("In other words, if the Commonwealth is entitled to sovereign immunity under Act 152, then its officials and employees acting within the scope of their duties are likewise immune.").  This grant of immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'"  Larsen v. State Employees' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008).  Conduct of an employee is within the scope of employment if " 'it is of a kind and nature that the employee is employed to perform; [and] it occurs substantially within the authorized time and space limits . . . .' "  Brautigan v. Fraley, No. 09-1723, 2010 WL 480856, *4 (M.D. Pa. Feb. 4, 2010) (Rambo, J.).  In this case, the defendants contend that they are each Commonwealth employees or officials, who were acting

within the scope of their employment in committing each of the acts alleged in this case. The allegations in the amended complaint support the defendants' contention in this regard.

The defendants also contend that none of the nine recognized exceptions to sovereign immunity apply here. In 42 Pa. Cons. Stat. Ann. § 8522(b), the General Assembly defined nine separate, narrow exceptions to the broad grant of sovereign immunity. These exceptions include: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. "Because of the clear intent to insulate government from exposure to tort liability, the exceptions to immunity are to be strictly construed." Lockwood v. City of Pittsburgh, 751 A.2d 1136, 1139 (Pa. 2000) (citation omitted). Based on fair reading of the amended complaint, it is clear that none of these exceptions has application in this case.

Given the broad grant of immunity provided by Pennsylvania law, and mindful of the narrow scope and application of the nine limited exceptions to sovereign immunity that plainly do not apply to the conduct alleged in this case, which involved the defendants' acts and decisions made in the scope of their duties with the

Department of Corrections, we conclude that the defendants in this case are immune from Booze's pendant state-law tort claims, and these claims should also be dismissed.

### H.    Booze's Remaining Claims Should Proceed Forward At This Time

While the defendants have sought dismissal of Booze's complaint in its entirety, we note that they have not addressed in their motion, Booze's complaints regarding the processing, and alleged theft, of his mail.  Therefore, this claim–and any other free-standing claims made by the plaintiff which have not been addressed in the defendants' motion to dismiss–should be permitted to proceed forward.

We further recognize that *pro se* plaintiffs should be afforded an opportunity to amend a complaint before the complaint is dismissed with prejudice, see Fletcher-Hardee Corp. v. Pote  Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless it is clear that granting further leave to amend would be futile, or result in undue delay. Alston v. Parker, 363 F.3d  229, 235 (3d Cir. 2004).  In this case, Booze has been provided an opportunity to amend his complaint, but to no avail.  His amended complaint still fails to state a claim upon which relief can be granted in several particulars, and given the inadequacy of this pleading, it appears that granting further leave to amend as to these legally flawed claims would be futile, or result in undue

delay.   <u>Alston v. Parker</u>, 363 F.3d  229, 235 (3d Cir. 2004).   Therefore, it is recommended that these claims be dismissed with prejudice.

### III.  **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that defendant Rosini's motion to dismiss the complaint, (Doc. 40.), be GRANTED, in part, as follows:

1.   Any claims pre-dating August 2011 should be dismissed as time-barred.

2.   Booze's due process claims relating to his placement in AC custody, designation on the RRL, and continued restricted housing custody should be dismissed.

3.   Booze's supervisory liability claims against defendants Wetzel, Klopotoski, Varano, Ellett, Miller, Luscavage, and Miller should be dismissed.

4.   Booze's retaliation, civil conspiracy, and access to courts claims, as pleaded, should be dismissed.

5.   Booze's pendant state law intentional tort claims should be dismissed.

In all other respects the motion to dismiss should be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 5th day of August 2015.

_**S/Martin C. Carlson**_
Martin C. Carlson
United States Magistrate Judge